Filed 2/25/20

OPINION ON REMAND FROM THE CALIFORNIA SUPREME COURT

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR GASTELUM,<br><br>    Defendant and Appellant. | D075368<br><br><br>(Super. Ct. No. RIF1770111) |

APPEAL from a judgment of the Superior Court of Riverside County, Candace J. Beason, Christian F. Thierbach, and David A. Gunn, Judges.  Affirmed as modified.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Victor Gastelum of the first degree murder of Terrance Rodgers with the special circumstance of lying-in-wait (Pen. Code, §§ 187, subd. (a), 190.2,

subd. (a)(15))[1] and the premeditated attempted murder of J.W. (§§ 187, subd. (a), 664, subd. (a)). As to both offenses, the jury found that Gastelum participated with the knowledge that another principal in the offense was armed with a firearm. (§ 12022, subd. (a)(1).) In bifurcated proceedings, the trial court found that Gastelum had suffered a prior prison term and had not remained free of custody or subsequent offense for five years thereafter. (Former § 667.5, subd. (b).) The court sentenced Gastelum to consecutive indeterminate terms of life imprisonment without the possibility of parole and life imprisonment with the possibility of parole, plus three years.

Gastelum appealed. He contended (1) the court erred under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) by instructing the jury that he could be convicted of first degree lying-in-wait murder under the natural and probable consequences doctrine and (2) the court erred by instructing the jury that it could find true the lying-in-wait special circumstance if it found Gastelum acted with "intent to kill," without specifying whom Gastelum must have intended to kill.

In our original opinion, we found Gastelum's contentions unpersuasive and affirmed the judgment. (*People v. Gastelum* (2019) 40 Cal.App.5th 772.) Gastelum petitioned for review by our Supreme Court. He reiterated these contentions and additionally argued that a newly enacted statute, Senate Bill No. 136 (Stats. 2019, ch. 590, § 1), should apply to him. The Supreme Court granted review and transferred the matter back to this court with directions "to vacate [our] decision and reconsider the

---

[1] Further statutory references are to the Penal Code.

cause in light of Senate Bill No. 136[.]" (*People v. Gastelum* (Jan. 22, 2020, S259025).) Senate Bill No. 136 amended section 667.5, subdivision (b) to limit the one-year prior prison term enhancement to sexually violent offenses. (Stats. 2019, ch. 590, § 1.)

We have reconsidered the matter as directed, and we conclude Senate Bill No. 136 applies here because the judgment against Gastelum is not yet final. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341 (*Lopez*).) Because Gastelum's prior prison term was for spousal abuse (§ 273.5, subd. (a)), not a sexually violent offense, the one-year prior prison term enhancement can no longer be imposed on him. We therefore modify the judgment to strike the one-year prior prison term enhancement and affirm the judgment as modified.

Our analysis of Gastelum's original contentions remains unchanged. As to the first contention, *Chiu* held that a defendant cannot be convicted of first degree *premeditated* murder as an aider and abettor based on the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) It did not consider the first degree *lying-in-wait* murder at issue here, and Gastelum has provided no persuasive argument why *Chiu* should be extended to this type of murder—particularly where, as here, the defendant and perpetrator are equally culpable, having committed all the same actions that gave rise to the lying-in-wait murder. As to the second contention, Gastelum forfeited any claim of error by failing to object at trial to the allegedly deficient instruction. And, assuming that competent counsel would have objected, Gastelum has not shown prejudice based on his counsel's failure to do so.

FACTS

At the time of the offenses, Gastelum was staying with his cousin, Jacob Gamboa. From his time living on the streets, Gastelum was acquainted with Rodgers and J.W., as well as another individual, L.M.

On June 24, 2016, Gastelum was smoking next to a liquor store in Riverside, California. J.W. approached and confronted him. J.W. believed Gastelum and his cousin Gamboa had assaulted a mutual friend. Gastelum said something that angered J.W., so J.W. punched Gastelum several times. During the fight, Gastelum dropped a portable speaker. Either J.W. or someone else picked it up, and J.W. ended up with it.

Later that night, J.W. was hanging out at a gas station with L.M. and Rodgers. J.W. heard someone call out his nickname. He turned around and saw Gastelum and another person, later identified as Gamboa. J.W. started to walk toward them, but then he noticed each of them was holding a gun. J.W. started to run. He heard gunshots and was hit in his left buttock. J.W. kept running and eventually met up with a friend. He was taken to a hospital, where he spent several days recovering. L.M. also suffered a gunshot wound to his buttocks and survived. Rodgers was shot five times, including twice in the head. He died at the scene.

Police obtained surveillance video of the initial fight in front of the liquor store, Gastelum and Gamboa's approach to the gas station, and parts of the shooting. The video showed that Gastelum and Gamboa parked some distance from the gas station and took a circuitous route toward the victims.

4

Police also obtained a cell phone video recorded by Gastelum and Gamboa after the shooting. At the beginning of the video, Gastelum said, "This video is for—fuck [J.W.] and all the niggas." Gamboa commented, "[T]here was not—not a better night than this. I—I got that fool. The same day that—the same day these fools tried to come and start some shit, is the same these—these fools got served." He said, "I fucking got that fucking nigger. Those fools were screaming fool." Gastelum responded, "Yeah I know and that's what P asked him in the beginning, 'Hey nigga you know how to dance?' "[2] Gastelum later said, "I wanted to record it, but I didn't have my phone." Gamboa talked about shooting one of the victims (presumably Rodgers) and explained, "[W]hen he hit, that's when I was on him, I'm like doom, doom, doom. And then that's when I started getting the rest of him." Gastelum remarked, "He paid for a nigger's mistakes." Gamboa said, "I know I hit every single one of them. Fuck yeah, they all got hit. That fool screamed like a little bitch." Gastelum responded, "Oh, yeah." A few days later, Gastelum told a friend, "We took care of those niggers."

At trial, the parties stipulated that only one gun was fired during the shooting. The parties also stipulated to certain statements Gastelum made to police. Gastelum said (1) he had problems with J.W. when he was living on the streets; (2) after J.W. punched him at the liquor store, he challenged J.W. to continue the fight; and (3) he was upset and angry after the fight because he had been hit, "especially by a black guy."

---

[2]     This statement is a reference to music lyrics. Gastelum later admitted he was making a joke about J.W. having to "dance" to dodge bullets.

5

Gastelum testified in his own defense. He admitted suffering a felony conviction for domestic violence, two misdemeanor convictions for domestic battery, and one misdemeanor conviction for false imprisonment. He also admitted he knew that Gamboa had been in prison several times "for guns" and had the nickname of "Maniac." He claimed he had a good relationship with Rodgers, J.W., and L.M.

Gastelum confirmed that J.W. confronted him at the liquor store about their mutual friend. He said he responded to J.W., "I don't know what the fuck you're talking about." Gastelum told the jury he did not assault the friend.

At the liquor store, J.W. hit Gastelum and knocked him to his knees. The portable speaker, which belonged to Gamboa, fell on the ground. J.W. picked up the speaker and started walking away. Gastelum told J.W. to return the speaker because it did not belong to him. J.W. replied, "Fuck you. Tell your cousin to come get it himself." Gastelum claimed he was not mad afterward; he just wanted the speaker back.

Gastelum called Gamboa. Gastelum told him he had been in a fight and J.W. took the speaker. Gamboa picked Gastelum up in his car. Gamboa was mad at Gastelum and J.W. They drove around looking for J.W. but could not find him. Gastelum and Gamboa went home.

Gamboa was still angry, but Gastelum was tired so he went to sleep. Later, according to Gastelum, Gamboa woke him up and said they should drive to get something to eat. On the way, Gamboa saw "some black guys" and thought one might be J.W. They drove around some more, and Gamboa parked. Gastelum claimed he thought

6

they were just going to fight J.W. and get the speaker back. He testified he was not armed and did not know Gamboa had a gun.

Gastelum and Gamboa walked in a roundabout way and eventually approached the victims. Gastelum saw several men but could not identify them because his eyesight is bad. He claimed not to know whether J.W., L.M., or Rodgers was there. Gastelum called out J.W.'s nickname to see if he was one of the men. (Gastelum claimed that he called out J.W.'s nickname on his own accord; he denied that Gamboa asked him to do so.) In response, J.W. turned around, and Gastelum recognized him because of his glasses.

Gamboa started shooting. Gastelum claimed to be surprised; he said he did not see Gamboa pull out a gun. After the shooting stopped, Gamboa and Gastelum ran back to Gamboa's car and drove home. Gastelum acknowledged recording the cell phone video recovered by police. He claimed he recorded it because he was upset and hurt. He asserted that the word "he" in his statement, "He paid for a nigger's mistakes," referred to J.W., not anyone else.

After his arrest, Gastelum lied to police about the shooting. He initially claimed he was not there, and then he told detectives he must have been sleepwalking or on drugs.

## DISCUSSION

### I

### *Natural and Probable Consequences Instruction*

The prosecution pursued two theories of liability against Gastelum for the first degree murder of Rodgers, one based on direct aiding and abetting and one based on the

7

natural and probable consequences doctrine. "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The intended crime is commonly described as the "target" offense, while the unintended crime is described as the "nontarget" offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 254.)

Gastelum contends the court erred by instructing the jury on the second theory of aiding and abetting because the natural and probable consequences doctrine cannot support liability for first degree lying-in-wait murder under *Chiu*, *supra*, 59 Cal.4th 155. He does not challenge the first theory based on direct aiding and abetting. We review the correctness of jury instructions de novo. (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642 [" 'Errors in jury instructions are questions of law, which we review de novo.' "].)

In order to hold Gastelum liable under the challenged theory, the prosecution was required to prove that Rodgers's murder was the natural and probable consequence of an offense Gastelum intended to commit. Here, the intended (or "target") offense was the attempted murder of J.W. The prosecution alleged that Gastelum directly aided and abetted the attempted murder of J.W. by Gamboa.

The unintended (or "nontarget") offense was the first degree lying-in-wait murder of Rodgers, also by Gamboa. The court's instructions told the jury that, to prove the

8

nontarget offense, the prosecution was required to prove that Gamboa (1) concealed his purpose from the person killed; (2) waited and watched for an opportunity to act; and (3) from a position of advantage, he intended to and did make a surprise attack on the person killed. (See CALCRIM No. 521.) The court's instructions continued, "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation and premeditation. Deliberation means carefully weighing the considerations for and against the choice and, knowing the consequences, decid[ing] to act. An act is done with premeditation if the decision to commit the act is made before the act is done." (See *ibid*.)

Under the court's instructions, to find Gastelum guilty of the nontarget offense of first degree murder, the jury was required to find (1) Gastelum was guilty of the attempted murder of J.W.; (2) during the commission of the attempted murder of J.W., a coparticipant in the attempted murder (i.e., Gamboa) committed the first degree murder of Rodgers; and (3) a reasonable person in Gastelum's position would have known that the first degree murder of Rodgers was a natural and probable consequence of the attempted murder of J.W. (See CALCRIM No. 402.)

In *Chiu*, our Supreme Court considered the scope of the natural and probable consequences doctrine in the context of first degree *premeditated* murder. It noted that aider and abettor liability is founded in statute (§ 31), but the statute's vague language allows and may even require judicial interpretation. (*Chiu*, *supra*, 59 Cal.4th at p. 164.) The natural and probable consequences doctrine, which has a long history at common

9

law, is part of that interpretation.  As such, courts may "determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application."  (*Ibid.*)

"Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature.  [Citations.]  'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.  [Citation.]  Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' "  (*Chiu*, *supra*, 59 Cal.4th at p. 164.)

*Chiu* distinguished between second degree murder and first degree premeditated murder, and held that the lesser "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine."  (*Chiu*, *supra*, 59 Cal.4th at p. 166.)  The court looked, in part, at the correlation between the defendant's culpability and the punishment imposed.  "A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the

perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it." (*Chiu*, *supra*, 59 Cal.4th at p. 165.)

But, with respect to first degree premeditated murder, the Supreme Court held that the same calculus did not apply. "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty

11

involved and the above stated public policy concern of deterrence."  (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Gastelum argues that *Chiu*'s reasoning should be extended beyond first degree *premeditated* murder to the first degree *lying-in-wait* murder at issue here.  We disagree. First degree premeditated murder is characterized by the "uniquely subjective and personal" mental state harbored by the perpetrator.  (*Chiu*, *supra*, 59 Cal.4th at p. 166.) First degree lying-in-wait murder, by contrast, is characterized by the objective facts of the killing itself, i.e., the manner in which the perpetrator carried out the murder.  As noted, the jury here was instructed that first degree lying-in-wait murder consists of the following elements:  (1) the perpetrator concealed his purpose from the person killed; (2) the perpetrator waited and watched for an opportunity to act; and (3) from a position of advantage, he intended to and did make a surprise attack on the person killed.  (See CALCRIM No. 521; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

These elements distinguish lying-in-wait murder from other murders, both morally and legally.  " 'Murder committed by lying in wait has been "anciently regarded . . . as a particularly heinous and repugnant crime." [Citation.]' [Citation.]  The moral culpability of the offender who murders by lying in wait justifies fixing the murder in the first degree."  (*People v. Stanley* (1995) 10 Cal.4th 764, 795 (*Stanley*); accord, *People v. Laws* (1993) 12 Cal.App.4th 786, 793 (*Laws*) ["The act of lying in wait with secret purpose in order to gain advantage and take a victim unawares is particularly repugnant and of aggravated character so as to justify harsher punishment when the lying in wait results in murder . . . ."].)

12

Because "the prosecution must prove the elements of concealment of purpose together with 'a substantial period of watching and waiting for an opportune time to act, and . . . immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage,' " a murder by lying-in-wait "present[s] 'a factual matrix . . . distinct from "ordinary" premeditated murder . . . .' " (*Stanley*, *supra*, 10 Cal.4th at pp. 795-796.) And, unlike ordinary premeditated murder, a lying-in-wait murder, committed with intent to kill, justifies the most severe punishment of death. (*People v. Sandoval* (2015) 62 Cal.4th 394, 416.) While in both cases the ultimate harm to the victim is the same, our laws and society have treated the two types of murders very differently.

Because lying-in-wait murder requires proof of certain conduct, rather than a "uniquely subjective and personal" mental state, the reasoning of *Chiu* is inapplicable. (See *Chiu*, *supra*, 59 Cal.4th at p. 166.) The disconnect identified in *Chiu* between the perpetrator's mental state and the aider and abettor's culpability is not present. (See *ibid*.) A lying-in-wait murder is murder of the first degree based on the objective facts of the perpetrator's conduct; it does not turn on the vagaries of the perpetrator's mind. It is therefore consistent with longstanding principles of the natural and probable consequences doctrine to hold the aider and abettor liable for first degree lying-in-wait murder. The exception identified in *Chiu* for first degree premeditated murder does not apply.

Gastelum points out that the elements of lying-in-wait murder act as the "functional equivalent" of proof of premeditation and deliberation, thus linking lying-in-

13

wait murder to premeditated murder. (See *People v. Boyette* (2002) 29 Cal.4th 381, 435.) The jury here was likewise instructed that the duration of lying-in-wait must show a state of mind equivalent to deliberation and premeditation. But this functional equivalency does not compel the same treatment under *Chiu*. The function of the different elements may be equivalent, but they remain distinct. (*Laws*, *supra*, 12 Cal.App.4th at p. 795.) One type of murder depends exclusively on the perpetrator's mental state; the other depends on the factual circumstances of the killing. This distinction justifies the application of *Chiu* in one instance but not the other.

We further conclude that extending *Chiu* is not warranted given Gastelum's specific conduct and culpability for the lying-in-wait murder of Rodgers. In concluding that a first degree premeditated murder conviction could not be based on the natural and probable consequences, the court in *Chiu* reasoned that the mental state required for first degree murder was uniquely subjective and personal to the perpetrator. Here, what elevates the offense to first degree murder is the *conduct* of lying in wait—conduct in which Gastelum and the perpetrator *both engaged*. None of this evidence regarding the actors' shared conduct, in essentially hunting and then killing the victim, is challenged on appeal. Because Gastelum was acting in lockstep with the perpetrator in lying in wait, this situation is unlike *Chiu*, where the connection between the defendant's culpability and the perpetrator's mental state was too attenuated to impose aider and abettor liability

14

for first degree murder.[3]  Gastelum was equally culpable for Rodgers's death.  Imposing

a lesser punishment for the nontarget offense of second degree murder, as in *Chiu*, is not

warranted here.

For these reasons, we conclude Gastelum has not shown the trial court erred by

instructing the jury on the natural and probable consequences doctrine.

II

*Special Circumstance Instruction*

The trial court instructed the jury on the special circumstance of lying-in-wait

using CALCRIM No. 702, as follows:  "If you decide that the defendant is guilty of first-

degree murder but was not the actual killer, then you must consider the special

circumstances of lying in wait under [section 190.2, subdivision (a)(15)].  You must also

decide whether the defendant acted with the intent to kill.  [¶]  In order to prove this

special circumstance for a defendant who is not the actual killer but who is guilty of first-

---

[3]     In *Chiu*, the target offense was assault or disturbing the peace.  (*Chiu*, *supra*,
59 Cal.4th at p. 160.)  The Court of Appeal in *In re Brigham* (2016) 3 Cal.App.5th 318,
327-329, held that *Chiu* applies even where the target offense is itself first degree
premeditated murder.  This decision does not alter our conclusion that *Chiu* is not
properly extended to Gastelum's conduct here.  In *Brigham*, the defendant intended to kill
one victim (Chuckie) and tried to stop the perpetrator from killing a different individual.
(*Id*. at p. 329.)  The court concluded that the perpetrator's "independent, intentional,
deliberate and premeditated decision to kill a different victim would reflect a personal
and subjective state of mind that was insufficiently connected to [Brigham's] culpability
for aiding and abetting the (intended) murder of Chuckie to justify holding [Brigham]
liable for [the perpetrator's] premeditated independent act." (*Ibid*.)  By contrast, as we
have already discussed, Gastelum and the perpetrator were not acting independently of
one another.  To the contrary, Gastelum facilitated the perpetrator's actions and later
celebrated the commission of their crimes, including the lying-in-wait murder of
Rodgers.

degree murder as an aider and abettor, the People must prove that the defendant acted with the intent to kill. [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill [for] the special circumstance of lying in wait . . . to be true. If the People have not met this burden, you must find this special circumstance has not been proved."

Gastelum did not object to this instruction at trial. On appeal, Gastelum contends the instruction was erroneous because it did not specify *whom* Gastelum must have intended to kill in order for the jury to find the special circumstance true. Gastelum argues that the jury could have understood the instruction to refer to J.W., rather than Rodgers, and it could have found the special circumstance true based only on Gastelum's intent to kill J.W.

As an initial matter, the Attorney General argues that Gastelum has forfeited this contention by failing to object in the trial court. We agree. " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Landry* (2016) 2 Cal.5th 52, 99-100.) Gastelum does not assert that the special circumstance instruction was an incorrect statement of law. He argues that the instruction was incomplete under the circumstances of this case. Because he did not propose clarifying or amplifying language in the trial court, his claim is forfeited. (*People v. Maury* (2003) 30 Cal.4th 342, 426; accord, *People v. Burnett* (2003) 110 Cal.App.4th 868, 875 [" '[W]hen a court has generally instructed on a point,

16

defendant must make a request for a more specific instruction or be deemed to have waived the point on appeal.' "].)

Anticipating this result, Gastelum argues his counsel was constitutionally ineffective by failing to propose language identifying Rodgers in the instruction. "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212.)

Even accepting that Gastelum's counsel should have proposed clarifying language, we conclude Gastelum has not shown prejudice. The evidence supporting Gastelum's intent to kill Rodgers was strong. Based on the unchallenged portions of the verdict, the jury found that Gastelum went out with Gamboa to find and kill at least J.W. After parking, they walked together in a circuitous route toward J.W., Rodgers, and L.M. Gastelum and Gamboa approached the group, and Gastelum lured J.W. toward them by calling out his nickname. When Gamboa started shooting at Rodgers and L.M., in addition to J.W., Gastelum did not act surprised. Instead, he fled with Gamboa and recorded a video celebrating the shooting. At the beginning of the video, Gastelum said, "This video is for—fuck [J.W.] and all the niggas." He did not limit his celebration to J.W. When Gamboa talked about shooting Rodgers multiple times, Gastelum remarked,

17

"He paid for a nigger's mistakes." Gamboa said, "I know I hit every single one of them. Fuck yeah, they all got hit. That fool screamed like a little bitch." Gastelum responded, "Oh, yeah." Gastelum's comments strongly support the conclusion that he intended the killing of Rodgers as well as J.W.[4]

Gastelum's defense, by contrast, was that he did not intend to kill *anyone*. He claimed to be surprised by the shooting and did not know Gamboa was carrying a gun. The jury by its verdicts plainly found Gastelum's testimony not credible.

Given the state of the evidence, and the unchallenged portions of the jury's verdict, there is no reasonable probability that the jury, or any single juror, would have made a different finding on the special circumstance allegation if the instruction had identified Rodgers specifically. The prosecution's evidence showed that Gastelum intended to kill Rodgers as well as J.W. and celebrated his shooting afterward. Gastelum's contrary testimony was rejected by the jury. Gastelum has not shown he is entitled to relief based on ineffective assistance of counsel.

---

4    Gastelum argues that he had no motive to kill Rodgers, so the jury might have found he did not intend his killing. Motive is not a required element, but it is a factor the jury may consider. (*People v. Stevenson* (2018) 25 Cal.App.5th 974, 987-988; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017.) Here, Gastelum's own statements show his motive: "He paid for a nigger's mistakes," i.e., Rodgers paid for J.W.'s mistakes. Rodgers was killed because he associated with J.W.

## III

### *Senate Bill No. 136*

As noted, our Supreme Court granted review and transferred this matter for reconsideration in light of newly-enacted Senate Bill No. 136, which amended Penal Code section 667.5, subdivision (b).  Prior to this amendment, the statute provided for a one-year enhancement for each prior separate prison term, unless the defendant remained free from both prison custody and the commission of a new felony for a five-year period after discharge.  (Former Pen. Code, § 667.5, subd. (b); *People v. Buycks* (2018) 5 Cal.5th 857, 889 (*Buycks*).)  After the amendment, "a one-year prior prison term enhancement will only apply if a defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b)."  (*Lopez*, *supra*, 42 Cal.App.5th at pp. 340-341; see Pen. Code, § 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)  The amended statute became effective January 1, 2020.  (*Lopez*, at p. 341; see Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a).)

Because the judgment against Gastelum is not yet final, the amended statute applies here.  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681-682; accord, *Lopez*, *supra*, 42 Cal.App.5th at p. 341; *People v. Petri* (Feb. 10, 2020) __ Cal.App.5th __ [2020 WL 614895, at *7]; *People v. Winn* (2020) 44 Cal.App.5th 859, 872.)  And, because Gastelum's prior prison term was for spousal abuse (§ 273.5, subd. (a)), not a sexually violent offense, the one-year prior prison term enhancement can no longer be imposed on him.

19

In general, when an error affects part of a sentence, we must remand for a full resentencing on all counts and allegations. (*Buycks*, *supra*, 5 Cal.5th at p. 893.) But where, as here, an enhancement is erroneously imposed and the trial court has already imposed the maximum possible sentence, a remand for resentencing is unnecessary. (*Id.* at p. 896, fn. 15.) We may simply strike the enhancement and affirm the judgment as modified. (*Lopez*, *supra*, 42 Cal.App.5th at p. 342.) We do so here.

## DISPOSITION

The judgment is modified to strike the one-year prior prison term enhancement imposed under former section 667.5, subdivision (b). As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.

20